The judgment of the United States Customs Court, Third Division, is *affirmed*.

UNITED STATES *v.* GENERAL DYESTUFF CORP. (No. 3478)[1]

---

[1] T. D. 45577.

United States Court of Customs and Patent Appeals, March 28, 1932

*Charles D. Lawrence,* Assistant Attorney General (*Thomas J. McKenna*' special attorney, of counsel), for the United States.
*Brown & Carter (Allan R. Brown* and *Fred J. Carter* of counsel) for appellee.
*John J. Lerch, amicus curiæ.*

[Oral argument February 8, 1932, by Mr. Lawrence, Mr. Lerch, and Mr. Carter]

Before GRAHAM, Presiding Judge, and BLAND, HATFIELD, GARRETT, and LENROOT, Associate Judges

GRAHAM, Presiding Judge, delivered the opinion of the court:

The General Dyestuff Corp., appellee, imported certain coal-tar dye known as discharge blue BG extra. This was appraised by the local appraiser at New York at its American selling price. We assume, from the conclusions of the court below and from the arguments of counsel, that this valuation was arrived at by the addition of

the American selling prices of two dyes made in the United States, namely, fast wool violet 2 R and fast acid green B, which dyes the appraiser found, when mixed in the proportion of 92 and 8 per centum, respectively, would produce a similar competitive article to the imported dyestuff.

The importer appealed to reappraisement, and the matter was heard by Associate Justice Brown. In this hearing, counsel stipulated, in substance, as follows: That the material imported was discharge blue BG extra; that it was a mixture; that if it were properly dutiable upon the United States value as defined in section 402 (d), the invoice value, or 64 cents a pound, would be such value; that at the time of exportation of the imported merchandise, there was on the markets of the United States an American product named fast acid green B and another named fast wool violet 2 R; that by making a mixture of 8 per centum of the former and 92 per centum of the latter, a mixture would be produced from which, when used in substantially the same manner as the imported material, a substantially similar or equal result would be obtained; that at the same time fast acid green B was being freely offered for sale in the markets of the United States, in the usual wholesale quantities, at a price of $2.80 per pound, less 2 per centum; and that fast wool violet 2 R was being likewise offered at $1 per pound, less 2 per centum.

The importers then offered the testimony of two witnesses to the effect that, at the time of exportation, these witnesses knew of no dyestuff being offered in the principal market of the United States which would produce substantially similar results to those produced by the imported dye, when used in substantially the same manner.

Thereupon the Government endeavored to prove certain facts, the substance of which is contained in the following offer:

Mr. STEIN. Exception. To satisfy Mr. Strauss, I offer to prove by this witness that the ordinary course of trade in his business was to offer constituent parts of this mixture, or for any other mixture which could be made out of any of the individual dyes which this firm had in stock and were able to sell in wholesale quantities on the date of exportation. I also offer to prove by this witness that it is the ordinary practice in the trade not to keep in stock the mixtures which they offer for sale, and that it is understood in the trade that if the individual dyes from which the mixture is made are in stock, that the mixture can be supplied. I offer to prove by this witness that having in stock each of the individual dyes which are used to make up this mixture, that they could supply the mixture in the percentages which have been stipulated here within 12 hours; that 12 hours is considered a prompt delivery in the trade; that it is the trade practice, and that it is understood in the trade that when individual dyes are being offered for sale in wholesale quantities, that any mixtures of those individual dyes in any proportions are simultaneously being offered. I also offer to prove that there is and there was a definite price at which each one of the individual dyes, viz, those used in this mixture, was being offered for sale in wholesale quantities in the United States, and that the price of mixtures offered for sale or actually sold by the National Aniline & Chemical Co. and others in

the trade is based upon the price at which the individual dyes are sold and in accordance with the percentage of that dye which goes to make up the mixture, at the exact component price of each of the individual dyes, depending upon the proportions used in making up the mixture. And in consequence thereof my offer is that that constitutes the American selling price of the article, or the price at which it is offered for sale, and that it is a price which is not speculative, but is definitely ascertainable as soon as it is known what the percentages of the individual dyes are to be made up into the mixture.

In connection with this offer, an attempt was made to show by witnesses that they were able to supply any commercial demands for this alleged competitive American mixture and that it was the trade practice in the United States, in the principal market, not to keep such mixtures on hand, but to make them up as ordered, in any shade or color.

The appraising justice excluded all such proffered testimony, holding, in effect, that unless the "identical mixture and composition of the imported article itself" was offered to the American trade at the time of exportation, no American selling price had been established. In so ruling, however, the justice sustained objections to three questions, of which one is typical—

Q. Now, Mr. Moorehouse, did you, or did you not, offer for sale in August, 1925, each of the two dyes which I have mentioned mixed in any proportion?

The United States Customs Court, Third Division, on review, reversed the judgment of the single justice, holding it error to sustain objections to the three questions noted, but affirmed said judgment as to the rulings upon the said offer to prove any kindred questions. Upon remand, Justice Brown refused to permit a general retrial, permitted the three questions above noted to be answered, and reaffirmed his former conclusions and findings. Upon appeal this judgment was affirmed by the Third Division. The Government appeals, alleging error, *inter alia*, in the rejection of the proffered testimony.

The material portion of paragraph 28 of the Tariff Act of 1922, under which the imported goods are classified, is as follows:

Par. 28. Coal-tar products: All colors, dyes, or stains, whether soluble or not in water, * * * and all mixtures, including solutions, consisting in whole or in part of any of the articles or materials provided for in this paragraph, excepting mixtures of synthetic odoriferous or aromatic chemicals, 45 per centum ad valorem based upon the American selling price (as defined in subdivision (f) of section 402, Title IV) of any similar competitive article manufactured or produced in the United States, and 7 cents per pound: * * * If there is no similar competitive article manufactured or produced in the United States, then the ad valorem rate shall be based upon the United States value, as defined in subdivision (d) of section 402, Title IV. For the purposes of this paragraph any coal-tar product provided for in this act shall be considered similar to or competitive with any imported coal-tar product which accomplishes results substantially equal to those accomplished by the domestic product when used in substantially the same manner: * * *.

American selling price is thus defined by section 402 (f) of said act:

(f) The American selling price of any article manufactured or produced in the United States shall be the price, including the cost of all containers and coverings of whatever nature and all other costs, charges, and expenses incident to placing the merchandise in condition packed ready for delivery, at which such article is freely offered for sale to all purchasers in the principal market of the United States, in the ordinary course of trade and in the usual wholesale quantities in such market, or the price that the manufacturer, producer, or owner would have received or was willing to receive for such merchandise when sold in the ordinary course of trade and in the usual wholesale quantities, at the time of exportation of the imported article.

It will be noted that said section 402 (f) establishes two methods by which the American selling price of an article may be fixed: First—

the price * * * at which such article is freely offered for sale to all purchasers * * *;

second—

the price that the manufacturer * * * would have received or was willing to receive for such merchandise when sold in the ordinary course of trade. * * *

In our opinion the trial court erred in sustaining objections to the testimony offered by the Government. The offer to prove, together with the questions to which objections were sustained, covered a broad field, and under them proof might have been introduced which would have substantiated the claim of the Government that there was a similar competitive article being offered in the principal market of the United States at the time of exportation.

It is not essential, in order to bring a coal-tar product within the purview of this paragraph and to call for an American selling price, that goods identical with the imported goods should be sold or offered for sale in the principal market of the United States at the time of exportation. The existence of a similar competitive article manufactured or produced in the United States might be established by showing that, although the identical product was not so manufactured or produced, one which would accomplish results substantially equal to the imported product, when used in substantially the same manner, was so manufactured or produced.

It is also equally apparent that if proof could be made that at the time of exportation, manufacturers or producers in the United States were fully acquainted with the methods of making a product which would accomplish results substantially equal to the imported product when used in substantially the same manner, and had on hand ample supplies of the materials for producing the same, and were ready and able to supply all demands for the same in the principal market of the United States in the ordinary course of trade and in the usual wholesale quantities in such market, and were at that time freely offering the same for sale, then such proof should have been admitted to

enable the court to determine whether such facts constituted a basis for fixing an American selling price under this paragraph.

Paragraph 28 should not be so narrowly and technically construed as to take from it the effect which the Congress, in enacting it, evidently intended it to have. Following the period of the World War, in an effort to build up and protect the dye industry of the country, the "Dye and Chemical Control Act, 1921," 42 Stat. 18, was enacted. This act declared an embargo upon foreign-made coal-tar dyes and intermediates for a stated period. Following this period, paragraphs 27 and 28 were inserted into the Tariff Act of 1922, which declared a virtual embargo for a 2-year period upon coal-tar products, followed by an American selling-price valuation. The obvious purpose of these paragraphs was to protect the domestic manufacturer of coal-tar products against similar competing foreign products, so that the domestic industry might become established.

No one who refers to the majority reports of the Committee on Ways and Means of the House of Representatives and the Finance Committee of the Senate upon H. R. 7456, which afterwards became the Tariff Act of 1922, can fail to be impressed with the concern of both houses of the Congress in this matter. H. R. Report No. 248, Part 1, Sixty-seventh Congress, first Session; Senate Report No. 595, Sixty-seventh Congress, second Session.

The matters herein involved are of such importance that the fullest opportunity ought to be given to both parties hereto to present any evidence—which will go to the issue presented—whether there was a similar competitive article to the imported product at the time of exportation of the imported goods. The court below and this court, if the matter should again come here, will be in much better position to determine all the involved issues of law and fact with such a complete record.

For these reasons, the judgment of the United States Customs Court, Third Division, is *reversed* and the cause is *remanded*, with directions to remand the same to the appraising judge for a new trial consistent with the views herein expressed.